2009 Ark. 333

FORT SMITH SCHOOL DISTRICT; Greenwood School District; Lavaca School District; Alma School District; Ozark School District; Mansfield School District; Van Buren School District; County Line School District; Charleston School District; Paris School District; Cedarville School District; Mulberry School District; Mountainburg School District; Bonneville School District; and James O. Cox, Esq., Appellants,

v.

Mike BEEBE, Governor, State of Arkansas; the Arkansas State Board of Education, Randy Lawson, Chair; Sherry Burrow; Diane Tatum; Dr. Naccaman Williams; Jim Cooper; Brenda Gullett; Samuel Ledbetter; Alice Williams Mahoney; and Dr. Ben Mays, All in their Official Capacities as Members of the State Board of Education, Appellees.

No. 08–618.

Supreme Court of Arkansas.

June 4, 2009.

Thompson and Llewellyn, P.A., by: James M. Llewellyn, Jr., and William P. Thompson, Fort Smith, for appellants.

Dustin McDaniel, Att'y Gen., by: Scott P. Richardson, Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice.

Appellants consist of various school districts in Arkansas [1] and James O. Cox, a taxpayer and resident of the Greenwood School District (together "Appellants"). Appellants originally filed a complaint against Mike Huckabee, in his capacity as Governor of Arkansas, and other state officials [2] (together "Appellees"), on May 30, 2003. The original complaint alleged that Appellees were illegally diverting equaliza-

---

**1.** School districts included are: Fort Smith School District, Greenwood School District, Lavaca School District, Alma School District, Ozark School District, Mansfield School District, Van Buren School District, County Line School District, Charleston School District, Paris School District, Cedarville School District, Mulberry School District, Mountainburg School District, Bryant School District, Jessieville School District, and Booneville School District.

**2.** State officials included in the original complaint were: Mike Huckabee, Governor, State of Arkansas; The Arkansas State Board of Education, Jonell Caldwell, Chair; Shelby Hillman; Mary Jane Rebick; Dr. Calvin King; Dr. Jeanna Westmoreland; Sherry Burrow; Randy Lawson; Diane Tatum; and Dr. Naccaman Williams, all in their official capacities as members of the State Board of Education.

tion funds (now called "foundation funds") to satisfy court-ordered desegregation costs in Pulaski County and to provide additional base funding for school districts that did not meet other funding standards. On September 4, 2003, Appellants filed their first amended complaint and raised the additional claim that Appellees were "divert[ing] funds from the Uniform Rate of Tax under Amendment 74 ... contrary to law." The first amended complaint also alleged that Appellees were diverting funds from the Educational Excellence Trust Fund "contrary to law."

Eventually, on May 24, 2005, Appellants filed another Complaint and Motion for Injunctive Relief, in which they asserted that "[t]his is an action for, among other things, illegal exaction and injunctive relief." The 2005 complaint alleges that Appellees were constructively retaining and unlawfully diverting funds derived from Amendment 74 property taxes and funds allocated to the Educational Excellence Trust Fund. Shortly thereafter, Appellees filed a motion to dismiss Appellants' complaint. The motion listed six grounds for dismissal: (1) Appellants lack standing to bring this action; (2) Appellants' complaint failed to state a claim on which relief could be granted; (3) the claims are barred by res judicata; (4) some of Appellants' claims are not ripe for adjudication; (5) Appellants' complaint failed to name necessary and indispensable parties; and (6) the State is immune from suit in state court for money damages. The circuit judge denied Appellees' motion to dismiss on October 26, 2006.

On August 8, 2007, Appellants moved for summary judgment. Appellees responded by filing their own motion for summary judgment on August 28, 2007, in which they listed the following grounds: (1) Appellants' claim for money damages are barred by Article 5, Section 2 of the Ar-

kansas Constitution; (2) Appellants' claims are barred by res judicata; (3) Appellants' "funds type" illegal-exaction claim entitles them to prospective injunctive relief only; (4) Appellants' claims relating to acts prior to 2002 are barred by the applicable statute of limitations; (5) Appellant school districts are neither taxpayers nor citizens and lack standing to sue for illegal-exaction; (6) Appellant James O. Cox's claims for refund of taxes spent prior to 2005 are barred by the voluntary payment rule; (7) Appellants' claims for injunctive relief are barred by separation of powers; (8) Appellants fail to state a claim upon which relief can be granted; and (9) Appellants' claims for injunctive relief are moot. On March 28, 2008, the circuit court denied Appellants' motion for summary judgment and granted summary judgment in favor of Appellees. It is from this order that Appellants appeal. We have jurisdiction over the instant case pursuant to Ark. Sup.Ct. R. 1–2(a)(1) and (b)(1), (3), (4) and (5) (2009).

## I. *Standard of Review*

In reviewing summary judgment cases, this court need only decide if the trial court's grant of summary judgment was appropriate based on whether the evidence presented by the moving party left a material question of fact unanswered. *Parker v. Perry*, 355 Ark. 97, 131 S.W.3d 338 (2003). The moving party always bears the burden of sustaining a motion for summary judgment. *Id.* All proof must be viewed in the light most favorable to the resisting party, and any doubts must be resolved against the moving party. *Id.* The moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law. *Id.*

Once the moving party makes a prima facie showing that it is entitled to summary judgment, the opponent must meet proof with proof showing a material issue of fact. *Parker v. Perry, supra.* However, if a moving party fails to offer proof on a controverted issue, summary judgment is not appropriate, regardless of whether the nonmoving party presents the court with any countervailing evidence. *Id.*

II. *Whether Appellees Constructively Retained or Misapplied the Uniform Rate of Tax Funds*

Appellants argue that amendment 74 provides funding for education in addition to state funding. They assert that the General Assembly, by subsequent legislative enactments, has used the growth in funding from ad valorem tax collections under the amendment to make a corresponding reduction in state foundation-funding aid. Appellants further suggest that, while the revenue generated from each county's ad valorem tax collection grows with changing property assessments, the State should still be required to contribute the same amount of foundation funding per student, even if that results in a total per pupil amount over that set by the General Assembly pursuant to Ark. Code Ann. § 6–20–2305 (Repl.2007).

Appellees counter Appellants' claims by asserting that amendment 74 does not place any limits on the General Assembly as to how it appropriates the money in excess of that generated by amendment 74. While Appellees acknowledge that the General Assembly must provide a substantially equal opportunity for an adequate education to the students of this State, they also point out that the Uniform Rate of Tax ("URT") alone generates nowhere near enough funding to meet the adequacy amounts set out in Ark.Code Ann. § 6–20–2305.

In effect, Appellants claim that there has been an illegal exaction because the State has retained and misapplied funds that were meant solely for the purpose of education. Article 16, section 13 of the Arkansas Constitution permits a citizen of this state to pursue an illegal-exaction claim. This court has stated that

> [a]n illegal exaction is defined as any exaction that either is not authorized by law or is contrary to law. Two types of illegal-exaction cases can arise under Article 16, Section 13: "public funds" cases, where the plaintiff contends that public funds generated from tax dollars are being misapplied or illegally spent, and "illegal-tax" cases, where the plaintiff asserts that the tax itself is illegal.

*White v. Ark. Capital Corp./Diamond State Ventures,* 365 Ark. 200, 206, 226 S.W.3d 825, 830 (2006) (internal citations omitted). This is a public funds case, and to prevail on their claim, Appellants must show that the State misapplied or illegally spent money that was lawfully collected pursuant to ad valorem property taxes.

In November 1996, the state's voters adopted amendment 74 to the Arkansas Constitution, amending article 14, section 3. Article 14, section 3 now reads in relevant part as follows:

(a) *The General Assembly shall provide for the support of common schools by general law.* In order to provide quality education, it is the goal of this state to provide a fair system for the distribution of funds. *It is recognized that, in providing such a system, some funding variations may be necessary. The primary reason for allowing such variations is to allow school districts, to the extent permissible, to raise additional*

*funds to enhance the educational system within the school district.* It is further recognized that funding variations or restrictions thereon may be necessary in order to comply with, or due to, other provisions of this Constitution, the United States Constitution, state or federal laws, or court orders.

(b)(1) There is established a uniform rate of ad valorem property tax of twenty-five (25) mills to be levied on the assessed value of all taxable real, personal, and utility property in the state to be used solely for maintenance and operation of the schools.

(2) *Except as provided in this subsection the uniform rate of tax shall not be an additional levy for maintenance and operation of the schools but shall replace a portion of the existing rate of tax levied by each school district available for maintenance and operation of schools in the school district.* The rate of tax available for maintenance and operation levied by each school district on the effective date of this amendment shall be reduced to reflect the levy of the uniform rate of tax. If the rate of tax available for maintenance and operation levied by a school district on the effective date of this amendment exceeds the uniform rate of tax, the excess rate of tax shall continue to be levied by the school district until changed as provided in subsection (c)(1). If the rate of tax available for maintenance and operation levied by a school district on the effective date of this amendment is less than the uniform rate of tax, the uniform rate of tax shall nevertheless be levied in the district.

(3) The uniform rate of tax shall be assessed and collected in the same manner as other school property taxes, but the net revenues from the uniform rate of tax shall be remitted to the State Treasurer and distributed by the state to the school districts as provided by law. *No portion of the revenues from the uniform rate of tax shall be retained by the state.* The revenues so distributed shall be used by the school districts solely for maintenance and operation of schools.

(4) The General Assembly may by law propose an increase or decrease in the uniform rate of tax and submit the question to the electors of the state at the next general election. If a majority of the electors of the state voting on the issue vote *For* the proposed increase or decrease in the uniform rate of tax, the uniform rate of tax shall be increased or decreased as approved. If a majority of the electors of the state voting on the issue vote *Against* the proposed increase or decrease in the uniform rate of tax, the uniform rate of tax shall continue to be levied at the rate for the year in which the election is held.

(c)(1) In addition to the uniform rate of tax provided in subsection (b), school districts are authorized to levy, by a vote of the qualified electors respectively thereof, an annual ad valorem property tax on the assessed value of taxable real, personal, and utility property for the maintenance and operation of schools and the retirement of indebtedness. The Board of Directors of each school district shall prepare, approve and make public not less than sixty (60) days in advance of the annual school election a proposed budget of expenditures deemed necessary to provide for the foregoing purposes, together with a rate of tax levy sufficient to provide the funds therefor, including the rate under any continuing levy for the retirement of indebtedness. The Board of Directors shall submit the tax at the annual school election or at such other time as may be provided by law. If a majority of the

qualified voters in the school district voting in the school election approve the rate of tax proposed by the Board of Directors, then the tax at the rate approved shall be collected as provided by law. In the event a majority of the qualified electors voting in the school election disapprove the proposed rate of tax, then the tax shall be collected at the rate approved in the last preceding school election. However, if the rate last approved has been modified pursuant to subsection (b) or (c)(2) of this section, then the tax shall be collected at the modified rate until another rate is approved.

Ark. Const. art. 14, § 3 (Repl.2004) (emphasis added). We construe constitutional amendments liberally to accomplish their purposes. *U.S. Term Limits, Inc. v. Hill,* 316 Ark. 251, 872 S.W.2d 349 (1994). It is the duty of the court to construe the constitution as written. *Cannon v. May,* 183 Ark. 107, 35 S.W.2d 70 (1931). We construe a constitutional provision in such a way that an express purpose or implied result will be given effect. *Rockefeller v. Hogue,* 244 Ark. 1029, 429 S.W.2d 85 (1968). It is also the duty of this court to construe constitutional sections so that the instrument as a whole is harmonious if it is possible to do so. *Huggins v. Wacaster,* 223 Ark. 390, 266 S.W.2d 58 (1954); *Chesshir v. Copeland,* 182 Ark. 425, 32 S.W.2d 301 (1930).

This court has analyzed the purpose and effect of amendment 74 many times and has stated,

Amendment 74 established the uniform rate of taxation of twenty-five mills for each school district to be levied on the assessed value of property and to be used solely for the maintenance and operation of the schools. The revenues collected are sent to the State, and the State later distributes the total funds back to the school districts.

*See, e.g., Lake View Sch. Dist. No. 25 v. Huckabee,* 364 Ark. 398, 402, 220 S.W.3d 645, 648 (2005) (*Lake View* 2005). The funds generated from the URT, however, only partially fund the basic foundation funding in any given year. *Id.* at 401, 220 S.W.3d at 647.

According to the Continuing Adequacy Evaluation Act of 2004, also known as Act 57, the General Assembly is required, in each interim, to conduct an assessment of the "entire spectrum of public education across the State of Arkansas to determine whether equal educational opportunity for an adequate education is being substantially afforded to the school children of the State of Arkansas." Ark.Code Ann. § 10–3–2102(a)(1) (Supp.2007). Senate and House committees are charged with conducting the assessment and must report their findings and recommendations to the President Pro Tempore of the Senate and the Speaker of the House of Representatives no later than September 1 of each year prior to the convening of a regular session. Ark.Code Ann. § 10–3–2104(a) (Supp.2007). Each report must include, among other things, a recommendation regarding resources needed. *Id.* § 10–3–2104(b).

The amount of foundation-funding aid each school district receives in a given year is computed as "the difference between the foundation funding amount pursuant to subdivision (a)(2) of this section and the sum of ninety-eight percent (98%) of the uniform rate of tax multiplied by the property assessment of the school district plus the miscellaneous funds of the school district." Ark.Code Ann. § 6–20–2305(a)(1)(A) (Repl.2007). Pursuant to subdivision (a)(2), the foundation funding amount for the 2007–2008 school year was set at $5,719 per student multiplied by the

school district's average daily membership for the previous school year and $5,789 per student for the 2008–2009 school year. *Id.* § 6–20–2305(a)(2)(A), (B). Thus, given the provisions of amendment 74 and the statutes enacted by the General Assembly, each school district in Arkansas, for the 2007–2008 school year, would receive foundation-funding aid according to the formula in section 6–20–2305(a)(1)(A). For example, in 2007–008, the State made up the difference between $5,719 per student and the revenue generated by the 25 mills URT in any given school district.

Appellants, nonetheless, argue that, even if the funding generated by the 25 mills URT grows as the value of the property increases, the State cannot reduce its funding accordingly. We disagree. Amendment 74 does not place any limits on the General Assembly as to how it appropriates the money in excess of that generated by amendment 74 ⌊11following the legislature's assessment of the resources needed to provide a substantially equal opportunity for an adequate education to the students of this State.

Amendment 74 provides that

[i]n order to provide quality education, it is the goal of this state to provide a fair system for the distribution of funds. It is recognized that, in providing such a system, some funding variations may be necessary. The primary reason for such variations is to allow school districts, to the extent permissible, to raise additional funds to enhance the educational system within the school district.

Art. 14, § 3(a) (Repl.2004). Appellants suggest that the reference to "additional funds" means the funds raised by the base millage rate of 25 mills (including any growth in collections). According to Appellants' rationale, this reference to the URT as "additional funds" implies that there should be no reduction in funds provided by other means. Such an interpretation, however, fails to take into account section 3(c)(1), which provides that, "[i]n *addition* to the uniform rate of tax provided in subsection (b) [25 mills], school districts are authorized to levy, by a vote of the qualified electors respectively thereof, an annual ad valorem property tax on the assessed value of taxable real, personal, and utility property for the maintenance and operation of schools and the retirement of indebtedness." Art. 14, § 3(c)(1) (emphasis added). Thus, according to its plain language, amendment 74 "allows for variances in school district revenues above the base millage rate of 25 mills, which may lead to enhanced curricula, facilities, and equipment which are superior to what is deemed adequate by the State." *Lake View Sch. Dist. No. 25 v. Huckabee,* 358 Ark. 137, 189 S.W.3d ⌊12 1 (2004) (*Lake View* 2004); *Lake View Sch. Dist. No. 25 v. Huckabee,* 351 Ark. 31, 43, 91 S.W.3d 472, 478 (2002)(*Lake View* 2002).

Appellants claim that, by reducing the funds from the State when there is growth in the revenue generated from the URT, the State is constructively retaining the URT funds. Once again, we must disagree. First, there is no dispute that the State distributes all URT funds collected back to the school districts. *Lake View* 2005, 364 Ark. at 402, 220 S.W.3d 645, 648. As noted by Appellees, the result urged by Appellants "would directly tie the adequacy amount to property wealth in the State." This court has decreed that the State of Arkansas must provide the children of this State with an adequate and substantially equal education. *Lake View Sch. Dist. No. 25 v. Huckabee,* 362 Ark. 520, 210 S.W.3d 28 (2005). We have expressly stated that, while amendment 74 does authorize funding variances, it "does not authorize a system of school funding that fails to close the gap between wealthy

school districts with premier educational programs and poor school districts on the lower end of the economic spectrum, which are mired in poverty and unable to provide a system of education much above the most elementary kind." *Lake View* 2002, 351 Ark. at 77, 91 S.W.3d at 499. The school-funding system, fashioned by the General Assembly in response to this court's decisions in the *Lake View* litigation, set a base level of funding per student required to provide a constitutionally adequate and substantially equal education. Ark.Code Ann. § 6–20–2305. To reach that amount of per-student funding, the URT revenues are calculated, and the State then makes up the difference with foundation-funding aid. In $\lfloor_{13}$sum, the twenty-five mills URT and the net revenues it generates are used to determine the amount of state foundation aid, as opposed to Appellants' premise that amendment 74 revenues merely supplement state funding. *Lake View* 2005, 364 Ark. at 402, 220 S.W.3d at 648.

In addition to the foundation funding set forth in section 6–20–2305(a)(2)(A) and (B), the General Assembly appropriated an additional $51.00 per student for the 2007–2008 school year and $36.00 for the 2008–2009 school year. Ark.Code Ann. § 6–20–2305(a)(2)(C)(i). The statute states that these funds, to be known as "Enhanced Educational Funding," are "in addition to the amount of funds necessary to provide an adequate education as required by the Arkansas Constitution." Ark.Code Ann. § 6–20–2305(a)(2)(C)(ii)(*b* ). The statute further states that the funds were "available from a combination of fortunate economic factors, conservative budgeting of all state government, and the favorable forecast of state revenues," but could not "be ensured and relied on beyond the 2007–2009 biennium." *Id.*

Appellants posit that this additional $87.00 per student over two years is the amount of amendment 74 growth over the same period. Accordingly, Appellants contend that this is evidence of the General Assembly's recognition that it must apply all of the growth in amendment 74 funds toward foundation funding. Such an argument is contrary to the statute's plain language. In fact, it is nothing more than a challenge to the adequacy of the $\lfloor_{14}$State's funding for education. We therefore conclude that Appellants' allegations concerning the application of amendment 74 funds do not support a claim for illegal exaction.

III. *Whether the State Constructively Retained and Misapplied Educational Excellence Trust Funds*

■■■ Appellants make a similar argument with respect to the Educational Excellence Trust Fund ("EETF"). Under section 6–5–308, the funds from general revenues allocated and accruing to the EETF were to supplement, not supplant, funding for public education in this case. Appellants assert that the State constructively retained funds from the EETF because, as the EETF grows, the funding to public schools either remains static, actually declines, or does not keep pace with the growth in EETF.

Appellees respond that EETF is a revenue source to fund the Public School Fund, and it does not replace the Public School Fund, but provides an additional source of revenue for that fund. The State alleges that there is no restriction on the General Assembly's ability to allocate this revenue source that it has created, and Appellants cannot have this court take over that role of the General Assembly and direct how state revenue is to be allocated.

The EETF was established in 1991 by Act 10, as amended, and is currently codified $\lfloor_{15}$at Ark.Code Ann. §§ 6–5–301 et seq.

(Repl.2007). Arkansas Code Annotated § 6–5–302 provides that a portion of specified general revenues is to be used to contribute to certain education accounts.[3] Ark.Code Ann. § 6–5–302 (Repl.2007). Section 6–5–308 is entitled "Legislative intent—Supplemental funding for public education" and states,

It is the intent of this subchapter to supplement, not to supplant, funding for public education in this state. Nothing herein shall be construed to reduce that portion of general revenue or growth revenues which would otherwise accrue to the Public School Fund. The moneys provided by this subchapter are intended to be in addition to those anticipated to be provided to fund public education for the children of this state at the same historical proportionate levels.

Ark.Code Ann. § 6–5–308 (Repl.2007).

Appellants contend that public school funding has been reduced after the establishment of the EETF and the State is using EETF proceeds "to meet the funding levels for an 'adequate' education to supplant state funds, but not to supplement that level." Appellants assert that, while state revenues increased from 1991 to 2006, the Public School Fund represented 49.79% of total state revenues in 1991; whereas, in 2006, the Public School Fund, excluding EETF proceeds, represented 44.05% of total state revenue. Appellees respond that the General Assembly appropriates state funds to the Public School Fund based not on available revenue, but on educational need as determined by the biennial studies performed pursuant to Act 57, codified at Ark.Code Ann. §§ 10–3–2101 to –2104. We agree. This court has expressly rejected a school-funding

system that looks primarily to the resources available instead of need. *See Lake View* 2002, 351 Ark. 31, 91 S.W.3d 472; Ark.Code Ann. § 6–20–2305.

Appellants have not shown how the State is using EETF funds to supplant its foundation-funding aid contribution to reach the amount per student established pursuant to section 6–20–2305. Thus, Appellants' illegal-exaction claim based upon the misapplication of EETF proceeds is without merit.

We agree with the circuit court that the Appellees are entitled to judgment as a matter of law. Because we affirm the circuit court's grant of summary judgment in favor of Appellees, we need not consider the affirmative defenses raised by Appellees.

Affirmed.

Special Justice GARY B. ROGERS, joins.

WILLS, J., not participating.

---

3. The EETF contributes to twenty-eight separate trust funds or accounts, two of which are part of the Public School Fund Account. The Public School Fund Account itself included sixty-five line-item appropriations for various educational programs, many of which were completely separate from the foundation funding aid set forth in section 6–20–305.